Hatfield Packing Company v. Commissioner.
Hatfield Packing Co. v. Commissioner
Docket Nos. 46734, 49340.
United States Tax Court
T.C. Memo 1955-264; 1955 Tax Ct. Memo LEXIS 72; 14 T.C.M. (CCH) 1048; T.C.M. (RIA) 55264; September 28, 1955
*72 Held: Reasonable allowances for salaries paid by petitioner to its officers in the taxable years ended June 30, 1948, 1949, and 1950 are not in excess of the amounts allowed by the Commissioner for those years. Charles S. Jacobs, Esq., for the petitioner. Edward Pesin, Esq., for the respondent. BRUCE Memorandum Findings of Fact and Opinion BRUCE, Judge: Respondent has determined deficiencies in income taxes for the years ended June 30, as follows: Year
Deficiency
1948
$10,925.30
1949
9,493.42
1950
15,329.56
Although the full amounts of the deficiencies determined by the Commissioner were placed in issue in the petitions, specific error was not raised as to certain of the item adjustments either in the pleadings or at the hearing. Accordingly, these adjustments are hereby deemed conceded. The issue presented is whether the sums paid by petitioner as salaries to its officers in the fiscal years ended June 30, 1948, 1949, and 1950 were "reasonable" within the meaning of section 23(a)(1)(A), Internal Revenue Code of 1939. These proceedings were consolidated for hearing and opinion. Findings of Fact Some of the facts were stipulated *73 and are so found and incorporated herein by reference. Petitioner is a Pennsylvania corporation organized on June 22, 1936 with its principal office in Hatfield, Pennsylvania. During the years here reviewed it maintained its books on the accrual method of accounting and filed its income tax returns with the collector of internal revenue for the first district of Pennsylvania. Petitioner is engaged in the meat packing business, producing principally pork products. In addition it sells cheeses, butter, and imported meats. Competition is particularly keen in petitioner's business and there are other plants of similar size and operation in the territory surrounding it. On October 6, 1946 all of petitioner's stock, consisting of 288 shares, was acquired for $141,120 by three brothers, John S. Clemens (hereinafter referred to as John), Abram S. Clemens (variously known in the record as Abram, Abraham, and Abe, and hereinafter referred to as Abram), and Lester S. Clemens (hereinafter referred to as Lester), who assumed responsibility for petitioner's operation and management. On August 18, 1947 Ezra S. Clemens (hereinafter referred to as Ezra) acquired 25 per cent of the outstanding *74 stock from his brothers, John, Abram, and Lester. As of August 26, 1947 and throughout the taxable years 1948 to 1950, inclusive, each of the Clemens brothers owned 72 shares of petitioner's stock. The officers of the Hatfield Packing Company from October 17, 1946 through the fiscal year ended June 30, 1950 were as follows: Fiscal
Years
Ended
June 30.
Oct. 17, 1946 to
1948, 1949,
June 30, 1947
1950
John S. Clemens
President
President
Lester S. Clemens
Vice President
Vice Presi-
dent
Abram S. Clemens
Secy. & Treas.
Treasurer
Ezra S. Clemens
Secretary
The birth dates of these officers were as follows: Officer
Date of Birth
John S. Clemens
Aug. 2, 1902
Abram S. Clemens
May 16, 1913
Ezra S. Clemens
Apr. 29, 1919
Lester S. Clemens
Nov. 6, 1921
The amounts paid and claimed by petitioner as deductions for officers' salaries in the taxable years here reviewed and the portions thereof determined to be excessive and disallowed by respondent are as follows: Amount
Paid
Disallowed
Year Ended June 30, 1948
John S. Clemens
$27,750
$ 7,250
Abram S. Clemens
25,500
7,250
Ezra S. Clemens
18,100
6,850
Lester S. Clemens
17,650
6,900
Year Ended June 30, 1949
John S. Clemens
$28,320
$ 5,150
Abram S. Clemens
25,770
4,250
Ezra S. Clemens
20,710
7,460
Lester S. Clemens
20,200
7,450
Year Ended June 30, 1950
John S. Clemens
$31,301
$12,581
Abram S. Clemens
28,483
11,453
Ezra S. Clemens
22,890
9,200
Lester S. Clemens
22,326
8,976
*75 The salaries paid by petitioner to its officers in the taxable years involved were paid pursuant to the following resolution by petitioner's board of directors on August 26, 1947: "Resolved, that, for services rendered to the Corporation, the management shall be compensated for such services in the following manner: The President shall receive $12,000.00 per Company's fiscal year, payable in any way he may elect; The Vice President shall receive $10,000.00 per Company's fiscal year, payable in any way he may elect; The Treasurer shall receive $12,000.00 per Company's fiscal year, payable in any way he may elect; The Secretary shall receive $10,000.00 per Company's fiscal year, payable in any way he may elect; and, in addition thereto, management may draw an amount equal to 5% of the sales for the year to be divided as management may agree, provided, however, the said 5% portion of compensation does not reduce profits for any one fiscal year below $25,000.00. This resolution to stand and be effective for years in the future until altered or amended by the Board of Directors. (Each Director and Officer interested in the foregoing resolution did not vote where his interest *76 was concerned.)" At the close of each of the taxable years reviewed and after consultation among the officers, who were also the sole directors of the company, additional salaries, the totals of which amounted to less than five per cent of the sales of each of the years, were paid to the officers in accordance with the bonus provisions of the above resolution. The Clemens brothers were raised in the Mennonite faith under which it was the custom for boys under the age of 21 and unmarried to work in their father's business without the usual compensation. As children they worked before and after school and during the summer for their father, John C. Clemens, in his packing plant, the Pleasant Valley Packing Company. At 14 each boy quit school and went to work full time for the senior Clemens, becoming thoroughly familiar with all phases of the business. In 1934 John took over management of the plant. In November 1940 John C. Clemens sold the Pleasant Valley Packing Company to his elder sons, John and Abram, who thereafter operated the plant as a partnership. At the time of the sale it was understood that John and Abram would subsequently take into the business with them their younger *77 brothers, Ezra and Lester. Prior to the sale and while they were working for the father John and Abram, having married, received a weekly wage and Ezra and Lester were given "spending money." Lester and Ezra continued working in the plant until they entered the armed services in September 1942 and September 1946, respectively. During their periods of service neither received any salary except that which was received from the military. Ezra received as salary for the year 1945 and for the first seven months of 1946 the respective amounts of $3,833.37 and $3,037.56. Upon his return to civilian life in January 1946 Lester resumed working for his brothers, John and Abram, and received $2,671.53 as salary for the period January 12, 1946 to July 31, 1946. Prior to the time Ezra and Lester began drawing salaries as officers of petitioner they never had earned in excess of the respective amounts of $3,833.37 and $2,671.53 from their employment either with their father or their brothers, John and Abram. John and Abram continued the Pleasant Valley Packing Company as a partnership until August 1, 1946, except that on April 1, 1944 their respective wives entered the partnership. Net operating *78 income of the partnership from November 2, 1940 through August 1, 1946, before any distribution to the partners, was as follows: Fiscal Year
Net
Operating
Beginning
Ending
Income
Nov. 2, 1940
Oct. 31, 1941
$18,685
Nov. 1, 1941
Oct. 31, 1942
24,367
Nov. 1, 1942
Oct. 31, 1943
42,135
Nov. 1, 1943
Mar. 31, 1944
41,645
Apr. 1, 1944
Mar. 31, 1945
62,827
Apr. 1, 1945
Mar. 31, 1946
78,564
Apr. 1, 1946
Aug. 1, 1946
33,311
On August 1, 1946 the packing plant of the Pleasant Valley Packing Company was completely destroyed by fire, which loss resulted ultimately in the decision of the Clemens brothers to buy petitioner's stock. In the years prior to the acquisition of its stock by the brothers petitioner's business was successful but not prosperous and its products enjoyed an excellent reputation not only in Hatfield but also in the surrounding communities of Philadelphia, Pottstown, and Allentown. Upon taking over petitioner's operation the Clemens immediately began making extensive improvements in the plant which their predecessors had allowed to become run down. Old machinery was repaired or discarded, new equipment was purchased, production *79 methods were revamped, and modern systems for slaughtering and processing were introduced. The brothers did their own planning and engineering, drawing upon their experience and upon investigation of other plants and trade publications. They did not, however, invent any new machinery, methods or equipment. As of June 30 of each fiscal year from 1946 through 1950 the cost of fixed assets used in the production and delivery of meat products was as follows: 1946
1947
1948
1949
1950
Auto trucks
$ 5,695
$ 5,230
$14,014
$ 17,483
$ 27,515
Factory buildings
34,489
34,692
37,596
38,437
46,518
Machinery and equipment
20,278
23,387
38,458
61,675
74,144
Office equipment
582
605
1,055
1,236
1,786
Hog pen
4,269
4,269
$61,044
$63,914
$91,123
$123,100
$154,232
Aside from their executive and administrative duties, each of petitioner's officers throughout the taxable years involved worked long hours in the plant on the killing and processing floor, on the loading platform or in the actual sale or delivery of petitioner's products. Around August 1946 government restrictions on various phases of business, including petitioner's, *80 which had been in effect since 1940, were lifted. Petitioner had been limited in the number of hogs permitted to be killed and pork products permitted to be sold, by price ceilings on those products and by rationing and wage controls. The termination of these restrictions contributed to a general upsurge of profits of all businesses during the years 1947 to 1951, including the meat packing business. During the years 1948 through 1950 the number of petitioner's full and part time employees was as follows: Full Time
Part Time
1948
27
15
1949
32
16
1950
38
16
Petitioner's gross sales less returns and allowances, net income before deduction of officers' salaries, officers' salaries paid, wages paid other than officers' salaries, and dividends paid for the fiscal years ended June 30, 1946 through June 30, 1950 are as follows: 1946
1947
1948
1949
1950
Gross sales less returns and allowances
$373,582
$1,369,407
$1,924,172
$2,116,740
$2,005,861
Net income before deduction of officers'
salaries
42,593
99,335
138,473
148,229
177,307
Officers' salaries paid
38,000
34,883
89,000
95,000
105,000
Wages paid other than officers' salaries
28,069
53,994
84,463
92,081
113,983
Dividends paid
None
9,792
None
2,880
2,880
*81 Reasonable allowances for salaries paid by petitioner to its officers in the taxable years ended June 30, 1948, 1949, and 1950 are not in excess of the amounts allowed by the Commissioner for those years. Opinion The issue presented is whether the amounts paid to the four officers of petitioner constitute reasonable compensation for services each rendered in the taxable years 1948, 1949, and 1950. This is a question of fact. Moreover, it was incumbent on petitioner to show that the total salaries paid and claimed as deductions or at least amounts in excess of those allowed represent reasonable compensation for the services rendered by its officers. Botany Worsted Mills v. United States, 278 U.S. 282; J. Warren Leach, 21 T.C. 70. Careful consideration has been given to all of the evidence appearing in the record but it does not justify a finding that reasonable compensation for any of the officers was in excess of the amounts allowed by respondent. In Mayson Manufacturing Co. v. Commissioner, 178 Fed. (2d) 115, 119, the court, though recognizing that each case must stand on its own facts and circumstances, enumerated several basic factors *82 to be considered in determining the reasonableness of compensation: "* * * Such factors include the employee's qualifications; the nature, extent and scope of the employee's work; the size and complexities of the business; a comparison of salaries paid with the gross income and the net income; the prevailing general economic conditions; comparison of salaries with distributions to stockholders; the prevailing rates of compensation for comparable positions in comparable concerns; the salary policy of the taxpayer as to all employees; and in the case of small corporations with a limited number of officers the amount of compensation paid to the particular employee in previous years. The action of the Board of Directors of a corporation in voting salaries for any given period is entitled to the presumption that such salaries are reasonable and proper. * * *" The presumption that salaries voted by the board of directors are reasonable is of negligible weight where, as in the instant proceeding, the directors are both the sole stockholders and the employees for whom the salaries were voted. J. Warren Leach, supra. The only evidence presented by petitioner related to the *83 experience, ability, and industry of its officers, to its earnings and profits, and to salaries and dividends paid. The table set forth in our findings shows that during the fiscal years 1948 to 1950, inclusive, a very substantial portion of the yearly earnings of petitioner, before deducting officers' salaries, was distributed to its officers in the form of salaries and that very modest dividends were paid in 1949 and 1950. In the taxable years 1948 and 1949 more than 63 per cent of the net income before deducting officers' salaries was distributed as compensation to the officers, and in the taxable year 1950 slightly more than 59 per cent. Officers' salaries paid in the 1946 fiscal year, the last year before assumption of control by the Clemens, were more than doubled and salaries paid in the 1947 fiscal year were almost tripled. In addition officers' salaries were increased by $6,000 in 1949 and were raised an additional $10,000 in 1950. It is also interesting to note that the total salaries paid to the officers during the taxable years 1948 and 1949 were in excess of the wages paid in those years to all other employees of petitioner combined, and in 1950 they were $8,983 less *84 than the salaries paid to other employees. The bonuses paid at the end of each year according to the directors' resolution of August 26, 1947 were based upon the earnings that the company had made during the year and its consequent ability to pay. Cf. Builders Steel Co. v. Commissioner, 197 Fed. (2d) 263. When the rather consistent policy of petitioner's board of directors to measure compensation for its officers by the corporation's ability to pay, rather than by the value of the services rendered, is considered there seems to be little doubt that there is merit in respondent's argument that some portion of the alleged compensation is intended as a distribution of earnings rather than to provide reasonable remuneration for services rendered. The fact that the bonuses were voted at the end of each fiscal year, when annual profits became known, supports this conclusion. Petitioner argues that the bonuses paid to each of the four officers were fixed only after consultation among the officers, who were also the directors of the company, and that recognition was given to the capabilities of each of the officers and to their respective responsibilities as well as to their *85 experience in the business. [1] We think it significant, however, that all of these qualities were known to petitioner on August 26, 1947 when the salary plan was determined. These men had been in the packing business for many years and the scope and character of the services anticipated were well known. We are likewise unimpressed with the argument that because the salaries were disproportionate to stockholdings they cannot be considered in lieu of dividends. Obviously, payment of salaries in proportion to stock ownership would have been a glaring admission that the alleged salaries were simply a distribution of profits. Similarly, the fact that the Clemens brothers paid themselves less than they had authority to do under the resolution does not make the salaries which they paid themselves any the less excessive. Neither are we impressed by the fact that during the three taxable years involved fixed assets used in the production and delivery of meat products increased $90,000 for at the same time *86 petitioner was paying its officers more than three times that amount in salaries. The record is completely devoid of any evidence of salaries paid for like services by comparable corporations. See Faucette Co., 17 T.C. 187. Likewise no evidence was presented by the petitioner as to what part, if any, of the increase in its sales was due to the peculiar achievements of its officers rather than to the lifting of the various government regulations. That fact is not without significance, particularly since petitioner was financially successful and its products enjoyed an excellent reputation prior to the acquisition of its stock by the Clemens. Furthermore, there is no evidence from which we might determine that the four brothers had received substantial salaries in the past. Petitioner contends that John and Abram split substantial profits while operating the partnership. However, there is no proof as to the disposition of the partnership income or as to the drawings of John and Abram. Ezra and Lester testified that they had never received over $3,833.37 and $2,671.53, respectively, from their employment either with their father in his sole proprietorship or from their *87 brothers, John and Abram, in the partnership; nevertheless, they received in the years reviewed the following amounts as salaries from petitioner: Ezra
Lester
1948
$18,100
$17,650
1949
20,710
20,200
1950
22,890
22,326
It does not appear that respondent has failed to consider the experience, ability, and industry of petitioner's officers in allowing the major portions of the amounts claimed as deductions for officers' salaries in the fiscal years 1948, 1949, and 1950. Accordingly, as petitioner has failed to meet its burden of proof we hereby sustain the deficiencies as determined. Decisions will be entered for the respondent. Footnotes
1. Petitioner's witness vaguely alluded to a "point" system which was used in determining the bonuses. However, the record is devoid of any evidence with regard to this procedure.↩